UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SOUTHWEST AIRLINES CO., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3: 06-CV-0891-B |
| | § | |
| BOARDFIRST, L.L.C., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM ORDER

In this lawsuit Southwest Airlines Co. ("Southwest") seeks injunctive relief and money damages against BoardFirst, L.L.C. ("BoardFirst") for allegedly violating the terms and conditions of use governing Southwest's website. Presently before the Court is Southwest's Motion for Partial Summary Judgment (doc. 111), filed June 29, 2007. For the reasons that follow, the Court GRANTS the motion in part and DENIES it in part.

### I. Background

Southwest, a major, Dallas-based domestic airline carrier, subscribes to a rather egalitarian philosophy when it comes to boarding its flights. There are no first-class cabins, and no fee-differentiated service class options are offered. (Pl.'s App. in Supp. Mot. Partial Summ. J. ["Pl. App."] 116). Instead Southwest maintains an "open seating" policy whereby its passengers are not assigned to specific seats but rather are divided into three distinct ("A", "B", and "C") boarding groups. (Pl.'s First Am. Compl. ["Compl."] ¶ 25). Passengers in the "A" group are entitled to board the plane before those in the "B" group, and those in the "B" group take precedence over the unfortunates with a "C" pass, who board last. (Id. at ¶¶ 25-28). Boarding passes are awarded on a

"first-come first served" basis – Southwest does not charge customers an extra fee to obtain a pass in a higher priority boarding group.  (Pl. App. 116).

Southwest customers who have purchased a ticket are able to check in for their flights via the Southwest website – www.southwest.com – within 24 hours of departure.  (Compl. ¶ 29).  The earlier a customer checks in during this 24-hour period, the more likely it is that the customer will be awarded an "A" boarding pass, which are limited to the first 45 customers who check in.  (*Id.* at ¶ 30; Pl. App. ¶ 116).  To check in online, a customer must go to southwest.com and click on a tab marked "Check in Online".  (*Id.*).  A window then opens in which the customer inputs his name and flight confirmation number.  (*Id.*).  The computer system then retrieves the customer's reservation and an image of the boarding pass appears.  (*Id.*).  The customer may opt to either print the pass, which may then be presented (along with appropriate identification) at the airport or the customer may wait to print the pass at the airport from a Southwest kiosk, ticket counter, or skycap.  (*Id.*).

BoardFirst began operations in Fall 2005.  (*Id.* at 61).  Its sole reason for being is to assist, for a fee, Southwest customers secure the coveted "A" boarding passes.  (*Id.* at 4, 7).  The company operates through its website – www.boardfirst.com – in the following way.  First, a Southwest customer who has previously purchased an electronic airline ticket from Southwest logs on to the BoardFirst site and requests assistance in obtaining an "A" pass.  (App. to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. ["Def. App."] 1-2).  The customer must provide his name, flight confirmation number, and credit card information and authorize BoardFirst to act as his agent.  (*Id.*).  Once the customer's boarding pass becomes available for online download from southwest.com, BoardFirst employees log on to the "Check In and Print Boarding Pass" page of the Southwest site and check the customer in using his personal information.  (*Id.* at 2).  If all went well, an "A" boarding pass

should appear on the screen. (Pl. App. 70). BoardFirst does not print the pass; it simply charges the customer's credit card (the fee is $5 per pass)[1] and e-mails the customer a receipt confirming that the pass was obtained and that it can be printed through southwest.com or at an airport kiosk. (Def. App. at 2-3). On average, BoardFirst procures fewer than 100 boarding passes for Southwest customers per day. (*Id.* at 3).

Southwest complains that BoardFirst's use of the Southwest website violates the terms and conditions of use (the "Terms") posted on the site. Southwest's homepage states in small black print at the bottom of the page that "[u]se of the Southwest websites . . . constitutes acceptance of our Terms and Conditions." (Pl. App. 116). Clicking on the words "Terms and Conditions", which are distinguished in blue print, sends the user to the Terms page. (*Id.* at 117). From December 20, 2005 through February 1, 2006, the Terms read in pertinent part as follows:

> Southwest's web sites and any Company Information is available to you only to learn about, evaluate, or purchase Southwest's services and products. **Unless you are an approved Southwest travel agent, you may use the Southwest web sites and any Company Information only for personal, non-commercial purposes.**
>
> . . .
>
> As a condition of your use of the Southwest web sites, you promise that you will not use the Southwest web sites or Company Information for any purpose that is unlawful or prohibited by these terms and conditions.

(*Id.* at 117, 124) (emphasis added). Effective February 1, 2006, and continuing to today, the Terms were modified to include the following additional language, indicated in bold:

> Southwest's web sites and any Company Information is available to you only to learn about, evaluate, or purchase Southwest's services and products. Unless you are an approved Southwest travel agent, you may use the Southwest web sites and any

---

[1] There is no charge if for some reason BoardFirst fails to obtain an "A" pass. (Def. App. 2).

Company Information only for personal, non-commercial purposes. **For example, third parties may not use the Southwest web sites for the purpose of checking Customers in online or attempting to obtain for them a boarding pass in any certain boarding group.**

(*Id.* at 117, 120) (emphasis added). Southwest expressly added this language so as to leave no doubt that BoardFirst's use of southwest.com was prohibited by the Terms. (*Id.* at 118).

On December 20, 2005, Southwest sent a cease-and-desist letter to Kate Bell, BoardFirst's founder, President, and Chief Executive Officer. (Pl. App. 4, 118, 128-129). Among other things, the letter apprised Bell that Southwest's Terms prohibited the use of southwest.com for commercial purposes and that BoardFirst's activities breached the Terms. (*Id.* at 129). When BoardFirst's use of the Southwest site did not stop in response to the letter, Southwest sent a second cease-and-desist letter on February 16, 2006. (*Id.* at 118, 132-34). Still, BoardFirst continued operations. Southwest responded with this lawsuit, filed on May 17, 2006. Southwest seeks to enjoin BoardFirst from using its site for commercial purposes and to recover damages for BoardFirst's past use of the site. Southwest asserts (among others) claims against BoardFirst for breach of contract, for violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and for Harmful Access By Computer under Chapter 143 of the Texas Civil Practice and Remedies Code. On June 29, 2007, Southwest filed a motion for partial summary judgment on these claims and on BoardFirst's counterclaims for tortious interference.

On July 30, 2007, BoardFirst filed its response to Southwest's motion for partial summary judgment, and, in the same instrument, purported to file its own cross-motion for partial summary

judgment.[2]  Southwest filed its summary judgment reply on August 14, 2007.  Southwest's motion, being fully briefed, is now ripe for adjudication.[3]

## II.  Analysis

### A.  Summary Judgment Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Only disputes about material facts will preclude the granting of summary judgment.  *Id.*

The burden is on the summary judgment movant to prove that no genuine issue of material

---

[2]  The Court has since stricken BoardFirst's cross-motion for partial summary judgment for failure to comply with Local Rule 56.2(b).

[3]  The Court takes this occasion to point out several deficiencies inherent in BoardFirst's responsive materials.  First, BoardFirst's response was late-filed.  Southwest filed its summary judgment motion on June 29, 2007.  BoardFirst's response was thus due to be filed by July 19, 2007.  *See* LOC. R. N.D. TEX. 7.1(e).  Instead, it was not filed until July 30, 2007.  Second, Local Rule 56.5(c) requires that "[a] party whose motion or response is accompanied by an appendix must include in its brief citations to each page of the appendix that supports each assertion that the party makes concerning the summary judgment evidence."  Although BoardFirst's response is accompanied by an appendix, BoardFirst fails to cite to specific appendix page numbers in its response brief.  BoardFirst chose instead to cite to paragraph numbers that correspond to the "Statement of Facts" section included in its response.  Even in the Statement of Facts, BoardFirst still does not cite to specific appendix page numbers as required but rather cites to page numbers that correspond to each item of summary judgment evidence relied upon.  Finally, BoardFirst has failed to provide the Court with courtesy copies of its responsive materials, as required by this Court's specific requirements.  *See* http://www.txnd.uscourts.gov/judges/jboyle_req.html.

In failing to follow the rules, counsel for BoardFirst has made the Court's task more difficult and disserved its client's interests.  Nevertheless, because these deficiencies have not substantially interfered with the Court's decisional process, the Court has declined to strike BoardFirst's defective court papers from the docket.  That said, BoardFirst is admonished that all future filings must comply with the local rules of this district and the specific requirements of this Court.

fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.*; *Little*, 37 F.3d at 1075.

Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita*, 475 U.S. at 587 (emphasis in original) (quoting FED. R. CIV. P. 56(e)). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the evidence must be sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000); *Anderson*, 477 U.S. at 248.

**B.     Choice of Law**

In deciding on the law to apply with respect to the parties' state-based claims, the Court applies the choice-of-law rules of the forum state, here being Texas. *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004). Absent a valid choice-of-law agreement, Texas courts apply the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. *Id.* Southwest urges the Court to apply Texas law because Southwest's principal place of business is in Texas and because it maintains its website, upon which this case is centered, on computers located in Texas. (Pl. App. 115-16). Having cited Texas cases throughout its briefing, BoardFirst appears to have

acquiesced in the application of Texas law.  Because the parties seem to agree that Texas law should apply to the state claims at issue in this lawsuit and because Texas appears to have the most significant relationship to the events underlying those claims, the Court will apply Texas law where applicable.

**C.      Breach of Contract**

      *1.      Have the Parties Formed a Valid Contract?*

To establish a breach of contract claim under Texas law, a plaintiff must prove: (1) the existence of a valid contract; (2) the plaintiff's performance or tendered performance; (3) the defendant's breach of the agreement; and (4) the plaintiff's resulting damages.  *See Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex. App. – Houston [1st Dist.] 2003, pet. denied).  For a contract to exist, the parties must manifest their mutual assent to be bound by it.  *See Alliance Milling Co. v. Eaton*, 25 S.W.614, 616 (1894).  The law is not concerned with the particular manner in which an offeree makes his assent known to the offeror provided that it is effectively communicated.  *See Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 210 (5th Cir. 1998).  Assent may be manifested directly, as by the written or spoken word, or indirectly, through one's actions or conduct.  *See R.R. Mgmt. Co., L.L.C. v. CFS Louisiana Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005); *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972).  "To manifest tacit assent to a contract through conduct, one must '[intend] to engage in the conduct and know [] or ha[ve] reason to know that the other party may infer from his conduct that he assents.'"  *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1291 (5th Cir. 1994) (quoting the RESTATEMENT (SECOND) OF CONTRACTS § 19(2)).

Southwest contends that the Terms listed on the home page to its website bound BoardFirst

to a contractual obligation once BoardFirst began using the site with knowledge of the Terms.  The home page explicitly states that "[u]se of the Southwest websites . . . constitutes acceptance of our Terms and Conditions."  (Pl. App. 116-17).  From December 20, 2005 through February 1, 2006, those Terms admonished users that "[u]nless you are an approved Southwest travel agent, you may use the Southwest web sites . . . only for personal, non-commercial purposes."  (*Id.* at 124).  Since February 1, 2006, the Terms elaborated that "third parties may not use the Southwest web sites for the purpose of checking Customers in online or attempting to obtain for them a boarding pass in any certain boarding group."  (*Id.* at 120).

The evidence shows that BoardFirst has had knowledge of the Terms as early as when Kate Bell, BoardFirst's founder, received the December 20, 2005 cease-and-desist letter from Southwest. (*Id.* at 93-94).  Southwest argues that, in continuing to use the Southwest site despite having actual knowledge of the Terms, BoardFirst effectively manifested its acceptance of Southwest's "offer" to use the site subject to the Terms, thus forming a binding contract between the parties.  Courts and commentators have labeled the type of agreement that Southwest seeks to enforce a "browsewrap" agreement.  Browsewraps may take various forms but typically they involve a situation where a notice on a website conditions use of the site upon compliance with certain terms or conditions, which may be included on the same page as the notice or accessible via a hyperlink.  *See e.g.*, Ian Rambarran & Robert Hunt, *Are Browse-Wrap Agreements All They Are Wrapped Up to Be?*, 9 TUL. J. TECH. & INTELL. PROP. 173, 174 (Spring 2007) ("[A] browse-wrap agreement is typically presented at the bottom of the Web site where acceptance is based on the 'use' of the site."); Melissa Robertson, Note, *Is Assent Still A Prerequisite for Contract Formation in Today's E-conomy?*, 78 WASH. L. REV. 265, 266 (Feb. 2003) ("Web sites with browse-wrap agreements usually display a notice on the site

that states that using the Web site binds users to the terms and conditions of the site."). A defining feature of a browsewrap license is that it does not require the user to manifest assent to the terms and conditions expressly – the user need not sign a document or click on an "accept" or "I agree" button.[4] A party instead gives his assent simply by using the website. *See Pollstar v. Gigmania, Ltd.*, 170 F.Supp.2d 974, 981 (E.D. Cal. 2000) ("[A] browse wrap license is part of the web site and the user assents to the contract when the user visits the web site.").

As browsewraps have become more prevalent in today's increasingly e-driven commercial landscape, the courts have been called upon to determine their enforceability. Though the outcomes in these cases are mixed, one general principle that emerges is that the validity of a browsewrap license turns on whether a website user has actual or constructive knowledge of a site's terms and conditions prior to using the site. *See* Mark A. Lemley, *Terms of Use*, 91 MINN. L. REV. 459, 477 (Dec. 2006) ("Courts may be willing to overlook the utter absence of assent only when there are reasons to believe that the defendant is aware of the plaintiff's terms."); Tarra Zynda, Note, *Ticketmaster Corp. v. Tickets.com, Inc.: Preserving Minimum Requirements of Contract on the Internet*, 19 BERKELEY TECH. L. J. 495, 507 (2004) (["S]o far, courts have held browsewrap agreements enforceable if the website provides sufficient notice of the license.").

Where a website fails to provide adequate notice of the terms, and there is no showing of actual or constructive knowledge, browsewraps have been found unenforceable. The Second

---

[4] In this sense browsewraps are distinguishable from so-called "clickwrap" agreements. *Compare Am. Eyewear, Inc., v. Peeper's Sunglasses & Accessories, Inc.*, 106 F.Supp.2d 895, 905 n. 15 (N.D. Tex. 2000) ("A 'clickwrap agreement' allows a consumer to assent to the terms of a contract by selecting an 'accept' button on the web site.") *with* Christina L. Kunz et al., *Browse-Wrap Agreements: Validity of Implied Assent in Electronic Form Agreements*, 59 BUS. LAW. 279, 280 (Nov. 2003) (using "the term 'browse-wrap' to mean terms and conditions, posted on a Web site or accessible on the screen to the user of a CD-ROM, that do not require the user to expressly manifest assent, such as by clicking 'yes' or 'I agree.'").

Circuit's decision in *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2nd Cir. 2002), illustrates the point.  In *Specht*, users of Netscape's web site were urged to download free software available on the site by clicking on a tinted button labeled "Download".  *Id.* at 22.  Only if a user scrolled down the page to the next screen did he come upon an invitation to review the full terms of the program's license agreement, available by hyperlink.  *Id.* at 23.  The full terms, which included an arbitration clause, warned users that they should not download the software if they did not agree to be bound by the terms.  *Id.* at 24.  The plaintiffs, not seeing the terms, downloaded the software and later sued for violations of federal privacy and computer fraud statutes arising from the use of the software.  *Id.* at 23-25.  Netscape sought to enforce the arbitration clause contained in the license agreement.

In addressing the validity of the license agreement, the Second Circuit noted that an essential ingredient to contract formation is the mutual manifestation of assent.  *Id.* at 28-29.  It found, however, that "a consumer's clicking on a download button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the download button would signify assent to those terms[.]" *Id.* at 29-30.  Because notice of Netscape's license terms was not reasonably conspicuous to an average user, the Court concluded that the plaintiffs were not placed even on constructive notice of the existence of such terms, and thus were not bound by them.  *Id.* at 30-32; *see also Ticketmaster Corp. v. Tickets.com, Inc.*, 2000 WL 525390, at *3 (C.D. Cal. March 27, 2000)  (dismissing Ticketmaster's breach of contract claim where the terms and conditions were situated at the bottom of the home page in "small print" but allowing leave to re-plead if there were facts showing that the defendant had knowledge of the terms and impliedly agreed to them).

The Second Circuit reached the opposite result in *Register.com, Inc. v. Verio, Inc.*, 356 F.3d

393 (2nd Cir. 2004), where it was undisputed that the users of a website had actual knowledge of the terms and conditions posted on the site.  In that case Register.com, a registrar of internet domain names, was contractually required to make its customers' contact information available free of charge to the public for any lawful purpose.  *Id*. at 396.  Register included a restrictive legend on its website stating that recipients of data from the website agreed not to use such data to transmit "mass unsolicited, commercial advertising or solicitation via email."  *Id.*  Notwithstanding the terms of the legend, Verio, Register's competitor, devised an automated robot to retrieve the contact information of new registrants on Register's site and then used that information to send marketing solicitations to the registrants by e-mail, telemarketing, and direct mail.  *Id.*  Register sued Verio for breach of contract and sought entry of a preliminary injunction, which the district court granted.

On appeal, Verio had conceded that it was aware of the restrictions Register placed on the use of the contact information and that by using such information for its own marketing opportunities  it was violating those restrictions.  *Id*. at 398.  Nevertheless Verio argued that it never became contractually bound to the conditions imposed by the legend because the legend did not appear on the screen until after Verio had made a query and received the desired information from Register's site – in other words, Verio claimed that it did not receive legally enforceable notice of the terms of use.  *Id.* at 401.  This argument held little purchase with the Second Circuit given the fact that Verio submitted queries on a daily basis and admitted that it had actual knowledge of the terms on which Register offered access to its data.  *Id.*  As the Court put it: "It is standard contract doctrine that when a benefit is offered subject to stated conditions, and the offeree makes a decision to take the benefit with knowledge of the terms of the offer, the taking constitutes an acceptance of the terms, which accordingly become binding on the offeree."  *Id.* at 403.  The Court made a point to

distinguish the facts at issue there from those in *Specht*.  The two cases were "crucially different", the Court found, because in *Specht*, "[t]here was no basis for imputing to the downloaders of Netscape's software knowledge of the terms on which the software was offered", whereas Verio had "admitted that, in entering Register's computers to get the data, it was fully aware of the terms on which Register offered the access."  *Id.* at 402; *see also Cairo, Inc. v. Crossmedia Servs., Inc.*, 2005 WL 756610, at *5 (N.D. Cal. April 1, 2005) (finding that company's use of a website with knowledge of terms of use posted on the site constituted an acceptance of the terms); *Ticketmaster Corp. v. Tickets.com, Inc.*, 2003 WL 21406289, at *2 (C.D. Cal. March 7, 2003) ("[A] contract can be formed by proceeding into the interior web pages after knowledge (or, in some cases, presumptive knowledge) of the conditions accepted when doing so.").

This case resembles *Verio* more than *Specht*.  There is no dispute that BoardFirst has had actual knowledge of Southwest's Terms at least since Kate Bell received from Southwest the December 20, 2005 cease-and-desist letter in which Southwest informed Bell that the Terms forbid the use of the Southwest website for commercial purposes.  (Pl. App. 14, 94, 106-07).  Despite having actual knowledge of the Terms, BoardFirst has continued to use the Southwest site in connection with its business.  In so doing BoardFirst bound itself to the contractual obligations imposed by the Terms.

     2.    *Has BoardFirst Breached the Terms?*

Having formed a binding contract, the Court next addresses whether BoardFirst breached it.  BoardFirst maintains that its activities do not breach the Terms for several reasons.  First, it argues that when it uses the Southwest website to retrieve boarding passes for its customers, it does so on behalf of and as the authorized agent of its customers, who, having purchased Southwest

tickets, are unquestionably entitled to use southwest.com to print their passes.  BoardFirst believes that because it acts as an authorized agent of its and Southwest's customers, it is in effect using the Southwest site as a Southwest customer, not as a prohibited "third party".  Southwest's Terms, however, plainly place restrictions on the *use* of the Southwest web site without regard to the user's status.  The Terms clearly state that the site may only be used for "personal, non-commercial purposes."  As of February 1, 2006, they go on to explain that one example of a prohibited commercial use is where a third party uses the site "for the purpose of checking Customers in online or attempting to obtain for them a boarding pass in any certain boarding group."  BoardFirst's activities fall within the heart of this proscription – it uses the site for the purpose of checking in Southwest customers in an attempt to obtain for them the prized "A" passes.  That BoardFirst is authorized to do so by their customers does not make its conduct any less of a violation of the Terms.

BoardFirst suggests that the term "third party" as used in the Terms is ambiguous because it is undefined and because Southwest has admitted that certain persons who are not the flying passenger, such as a spouse or employee of the passenger, may log on to southwest.com to obtain a boarding pass for the flying passenger.  BoardFirst has pointed to no record evidence to support any such admissions on Southwest's part, however.  (Def. Resp. Brief 7).  And even if it did, the hypotheticals presented by BoardFirst seemingly would not run afoul of the Terms, the evident overriding aim of which is to prevent the Southwest site from being used for *commercial purposes*. Only as an example of what would constitute a prohibited commercial purpose do the Terms forbid a third party from using the site to check in a Southwest customer with a view to obtaining a boarding pass in a particular boarding group.  While a spouse may very well be a "third party" using the site for the purpose of checking in a Southwest customer, one would presume that the spouse is

not profiting from the deal, and hence his or her use would not be for a *commercial* purpose. Contrast that scenario with BoardFirst's use of the Southwest site, which is *always* intended as a money-making proposition. And regardless, the scenarios imagined by BoardFirst are simply not presented to the Court in this case – the straightforward task before this Court is to decide whether *BoardFirst's* use of southwest.com violates the Terms as a matter of law. Plainly it does.

BoardFirst also argues that the Terms as a whole are "ambiguous and unenforceable", but it fails to actually identify the specific provisions it believes are ambiguous. (Def. Resp. Brief 5-6). Instead it argues that the Terms appear to prohibit a wider spectrum of conduct than Southwest actually intends to forbid. For example, BoardFirst contends that because the ordinary dictionary definition of the term "commercial" encompasses the activity of buying or selling, "[e]very person who purchases a ticket through Southwest's website is necessarily engaging in a commercial transaction and is consequently in violation of the Southwest.com Terms and Conditions as written." (*Id.* at 6). The Court declines BoardFirst's invitation to throw common sense to the wind in ascertaining the meaning of the term "commercial" as used in the Terms. *See Fujimoto v. Rio Grande Pickle Co.*, 414 F.2d 648, 654 (5th Cir. 1969) ("[T]he courts will not construe a contract to mean that the parties have agreed to act contrary to what common sense and the circumstances obviously demand, unless the contract is explicit and clear in that meaning."); *Bell v. Kirby Petroleum Co.*, 269 S.W. 170, 173 (Tex. Civ. App. – Galveston 1925, writ dism'd w.o.j.) ("A safe and accurate interpretation of words used in a contract may be had by viewing the subject of the contract as the mass of mankind would view it."). Through the Terms Southwest manifestly intends to prevent others – not itself – from using its website as an engine of profit. BoardFirst's use of the site to charge its customers a $5 fee for each "A" boarding pass obtained fits comfortably within any common sense

- 14 -

definition of the term "commercial".

Finally, BoardFirst points out that the Terms also limit the use of the Southwest site "to learn about, evaluate, or purchase Southwest's services and products." (Def. Resp. Brief 6). BoardFirst contends that under this provision a contract violation occurs every time a user books a car or hotel reservation through one of Southwest's sponsored service providers located on the site. (*Id.*). Moreover, BoardFirst suggests that this language even prevents a Southwest customer from obtaining a boarding pass through the site because doing so does not involve learning about, evaluating, or purchasing a Southwest product or service. (*Id.*). Not only do BoardFirst's specious constructions of the Terms strain the bounds of common sense, but they also present scenarios and involve the interpretation of provisions that are not currently before the Court. Perhaps one day Southwest will decide to sue one of its own customers for obtaining a boarding pass from southwest.com or for patronizing one of the company's corporate partners via the site. But the question here, once more, is strictly whether *BoardFirst's* activities violate the Terms. For all of the reasons just discussed, the Court finds that they do.

> 3.    *Has Southwest Sustained Damages By Reason of BoardFirst's Conduct?*

As support for its claim of damages flowing from BoardFirst's breach of the Terms, Southwest submits the testimony of its designated expert, Wendy Moe, Ph.D., an expert in online consumer behavior and currently an Associate Professor of Marketing at the University of Maryland. (Pl. App. 43). Moe states that the nature of the service offered by BoardFirst – where BoardFirst logs onto the Southwest site to check in Southwest passengers for flights – necessarily diverts Southwest's customers from visiting the Southwest site themselves. (*Id.*). The decreased traffic flow to southwest.com by Southwest customers, Moe concludes, deprives Southwest of valuable selling and

advertising opportunities.  (*Id.* at 44-46).  She also posits that the existence of companies like BoardFirst negatively impacts the Southwest brand.  (*Id.* at 45).

Moe starts with the proposition that visits to Southwest's website are valuable assets in themselves because each customer visit creates an opportunity for Southwest to sell additional airline tickets or to cross-sell hotel and rental car reservations for Southwest's corporate partners.  (*Id.* at 43-44).  For example, southwest.com's clickstream data shows that for just the months of January and February 2007, over 200,000 check-in visits immediately led to the sale of an additional service item, such as an air travel ticket or hotel or rental car reservation available on the site.  (*Id.* at 44-45).  Moe states that these additional sales opportunities are at risk if Southwest customers avoid the online check-in process altogether by using a third party such as BoardFirst to check in for them.  (*Id.*).  And even if a customer checking in online does not immediately make an additional online purchase, Moe says  that there is still value in having customers check in for Southwest flights via the company website themselves because when doing so they have a tendency to browse other parts of the site, which may lead to future sales.  (*Id.* at 45).

Moe also opines that web site visits carry a valuable advertising effect.  According to Moe, "[r]esearch has shown the existence of mere exposure effects where customers can develop a more positive opinion about a brand simply by being exposed to it."  (*Id.* at 46).  Thus, the value of the Southwest brand increases each time an online shopper simply pays a visit to the Southwest site.  (*Id.*).  Moe concludes that by diverting Southwest's customers from checking in for flights on the Southwest site directly, BoardFirst reduces the likelihood that these customers will be "repeat players" on the site, hence diminishing the long-term value of the company.  (*Id.*)

Finally, Moe states that the nature of BoardFirst's business interferes with Southwest's brand-

building efforts.  (*Id.* at 46-47).  She states that the fact that Southwest does not divide cabins on its planes into classes is not by accident – the company intends to project a sense of equality among passengers.  (*Id.*).  Moe suggests that the services provided by companies like BoardFirst create a de facto "first class" for Southwest flights because they allow for Southwest customers to pay extra money in return for guaranteed priority seating.  (*Id.*).  This practice, says Moe, serves to undermine the egalitarian service philosophy that Southwest has sought to promote for so many years, which in turn negatively impacts the Southwest brand.  (*Id.*).

BoardFirst offers no expert testimony to refute Moe's opinions.  Instead BoardFirst claims that Southwest is not entitled to summary judgment on its breach of contract claim because it has neither offered any evidence quantifying its purported damages nor offered any framework by which its damages may be calculated with any reasonable degree of precision.  BoardFirst points out that neither Moe nor Southwest's corporate representative on damages have calculated the number of website visits or the amount of sales revenue lost by Southwest as a result of BoardFirst's activities.  (Def. App. 39, 61, 65).  Southwest in fact concedes that it is difficult if not impossible to ascertain the precise amount of economic harm BoardFirst's business causes it.  (Pl. App. 42).

Simply because Southwest's damages are not readily calculable does not foreclose it from prevailing on its breach of contract claim.  Texas courts recognize a distinction between uncertainty about the *fact* that damages have been sustained and uncertainty as to their *amount*.  *See Dyll v. Adams*, 167 F.3d 945, 947 (5th Cir. 1999) (applying Texas law).  "Uncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery."  *Id.* (quoting *McKnight v. Hill & Hill Exterminators*, 689 S.W.2d 206, 207 (Tex. 1985)).  "A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of

- 17 -

damages." *Southwest Battery Corp. v. Owen*, 115 S.W.2d 1097, 1099 (Tex. 1938). Moreover, under Texas law a plaintiff's failure to prove actual damages stemming from a breach of contract does not prevent recovery on a contract theory; nominal damages may still be obtained upon proof that a contract was formed and breached. *See Centre Equities, Inc. v. Tingley*, 106 S.W.3d 143, 154 n. 7 (Tex. App. – Austin 2003, no pet.); *Fisher v. Westinghouse Credit Corp.*, 760 S.W.2d 802, 808 (Tex. App. – Dallas 1988, no writ); *Houston Pipe Line Co. v. Oxy Petroleum, Inc.*, 597 S.W.2d 57, 59 (Tex. App. – Corpus Christi 1980, writ dism'd); *Gilmore v. SCI Texas Funeral Servs., Inc.*, – S.W.3d –, 2007 WL 2325811, at *6 (Tex. App. – Waco Aug. 15, 2007, no pet. h.); *Tenneco Chems., Inc. v. Gulf Naval Stores Co.*, 388 F.2d 302, 304 (5th Cir. 1968).

To challenge the notion that Southwest has suffered any harm as a result of its business, BoardFirst offers only the anecdotal testimony of two of its customers, James Ponte and Dick Gordon. BoardFirst uses their testimony to contest Moe's assumption that users of BoardFirst necessarily bypass the Southwest site altogether based on the fact that Ponte and Gordon, both BoardFirst users, still use southwest.com to print out their Southwest boarding passes obtained by BoardFirst. (Def. App. 18-19, 24-25). Southwest responds by pointing out that a passenger who utilizes BoardFirst's service to check in for a flight also has the option of printing his or her boarding pass at the airport from a Southwest kiosk, ticket counter, or skycap. (Pl. App. 116). Realistically speaking, in a world without BoardFirst, a Southwest customer with any hopes of obtaining an "A" pass *must* visit southwest.com to check in for a flight, whereas with BoardFirst, the same customer could sidestep the Southwest site completely by paying BoardFirst to check in for him or her and picking up the boarding pass at the airport. That two particular BoardFirst customers sometimes opt to print their boarding passes via southwest.com does not undercut Moe's basic opinion that BoardFirst's business

diverts traffic from the Southwest site and harms Southwest by doing so.

BoardFirst also criticizes Moe for failing to consider whether the existence of a company like BoardFirst may actually be a boon to Southwest's business by attracting more customers to fly Southwest than otherwise would. Gordon, for example, states that he rarely flew Southwest before using BoardFirst's service due to past unpleasant experiences with Southwest's open seating practices, and both Ponte and Gordon aver that they are more likely to fly Southwest because they can use BoardFirst's service. (Def. App. 16, 22-23). The Court finds that these two isolated, anecdotal examples are insufficient as a matter of law to create a triable fact issue as to whether Southwest has been damaged by BoardFirst's activities. *Cf. Door Sys. Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 173 (7th Cir.1996) (stating that "plaintiff's evidence that two consumers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion . . ..").

Based on the (essentially unrefuted) expert testimony proffered by Southwest, the Court finds that Southwest has adequately demonstrated that it has suffered *some* injury from BoardFirst's business such that it is entitled to summary judgment on its breach of contract claim. Simply because Southwest is unable to prove the amount of its damages does not preclude summary judgment. Having established the existence of a contract and BoardFirst's breach of it, the Court finds that Southwest has at least shown its entitlement to nominal damages. *See Centre Equities, Inc.*, 106 S.W.3d at 154 n. 7; *Fisher*, 760 S.W.2d at 808. Though Southwest purports to reserve proof of the precise amount of its damages for trial, it also states repeatedly throughout its briefing that its damages are "difficult or impossible to ascertain" and that "the very nature of BoardFirst's activity precludes certainty in fixing the amount of damages[.]" (Pl. MSJ Brief at 23; Pl. Reply Brief at 3).

Indeed Southwest argues that one of the reasons it is entitled to a permanent injunction is due to the difficulty, if not impossibility, of quantifying its damages.  Southwest cannot have it both ways.  If Southwest was unable to devise a reliable method of proving damages at the summary judgment stage, there is little to suggest that it will suddenly be able to do so between now and trial.  The fact is, and the summary judgment evidence shows, that Southwest's damages *are* impossible to quantify, which is precisely why, as the Court discusses later, the remedy of an injunction is peculiarly suitable to Southwest's contract claim.  There is thus nothing to determine at trial with respect to Southwest's contract-based damages.

## D.   Computer Fraud and Abuse Act ("CFAA")

The CFAA criminalizes various fraudulent and related activities in connection with the use, or misuse, or computers.  *See Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1156 (5th Cir. 2006); *P.C. Yonkers, Inc. v. Celebrations The Party and Seasonal Superstore, LLC*, 428 F.3d 504, 510 (3rd Cir. 2005).  The statute also provides for a civil cause of action under § 1030(g):

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.  A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B) . . . .

18 U.S.C. § 1030(g).  The Fifth Circuit has clarified that "although § 1030(g) refers to subsection (a)(5)(B), the statute does not limit civil suits to violations of § 1030(a)(5)."  *Fiber Sys.*, 470 F.3d at 1157.  The only limitation is that a claim brought under one of § 1030's other subsections must have caused some form of damage described in one of the five numbered clauses of subsection (a)(5)(B).  *Id.*  The only clause of potential applicability here is § 1030(a)(5)(B)(i), which requires "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value[.]" 18

U.S.C. § 1030(a)(5)(B)(i).

The substantive provision under which Southwest sues is 18 U.S.C. § 1030(a)(2)(C), which makes liable a person who "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains [] information from any protected computer if the conduct involved an interstate or foreign communication." Thus, BoardFirst may be held civilly liable under § 1030(g) only if it has violated §1030(a)(2)(C) and, as a result of such violation, Southwest has suffered "loss" totaling at least $5,000 during any one-year period.

The Court begins by examining whether it can be said that BoardFirst "intentionally access[ed]" Southwest's computer. The CFAA does not define the term "access". The dictionary definition of the word, when used as a transitive verb, means "to get at" or "gain access to". MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 6 (10th ed. 1998). "Access", as a noun, alternatively means "permission, liberty, or ability to enter [or] communicate with" or the "freedom or ability to obtain or make use of". *Id.*; *see also United States v. Phillips*, 477 F.3d 215, 220 n.4 (5th Cir. 2007) (citing cases interpreting what it means to obtain access to a protected computer under the CFAA); *Am. Online, Inc. v. Nat'l Health Care Discount, Inc.*, 121 F.Supp.2d 1255, 1272-73 (N.D. Iowa 2000) (defining access as the "'freedom or ability to . . . make use of' something"); Matthew Beierlein, *Policing the Wireless World: Access Liability in the Open Wi-Fi Era*, 67 OHIO ST. L.J. 1123, 1155 (2006) ("Although the term 'access' is undefined, some courts have broadly construed it in a manner that would encompass conduct such as a computer communicating to another computer via a wireless network."); Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L. REV. 1596, 1646-47 (Nov. 2003) (proposing that "access" be defined as "any successful interaction with the computer.").

Here, BoardFirst's use of Southwest's website easily falls within any reasonable construction of the word "access". There is no dispute that, in conducting its business, BoardFirst logs on to southwest.com and enters the flight confirmation numbers and names of its customers and clicks on the appropriate boxes in order to obtain an "A" boarding pass. (Pl. App. 8-9). Upon inputting this information, BoardFirst immediately learns from the Southwest site what type of boarding pass has been received. (*Id.* at 9). Thus, in its operations BoardFirst makes free use of southwest.com and exchanges information with it. By any interpretation, BoardFirst "intentionally accesses" the Southwest site.

The more vexing question is whether BoardFirst has proved as a matter of law that BoardFirst's access of southwest.com was "without authorization" or "exceed[ed] authorized access" within the meaning of the CFAA. Although it is not entirely clear whether Southwest is proceeding on the theory that BoardFirst's conduct was "without authorization" or "exceed[ed] authorized access", the thrust of its argument suggests that BoardFirst's access was unauthorized. (Pl. MSJ Brief at 18-19). Southwest argues that the way in which BoardFirst uses the site – to check in Southwest customers for a fee – is "without authorization" because the Terms expressly forbid use of the site for commercial purposes and because Southwest has repeatedly informed BoardFirst directly that it does not have Southwest's authorization to use southwest.com as a money-making tool. BoardFirst responds by merely recycling the same arguments it advanced in response to Southwest's breach of contract claim – namely, that the Terms "do not clearly forbid a third party from obtaining another's boarding pass." (Def. Resp. Brief 8). As previously explained, however, the Terms could not more clearly prohibit third parties such as BoardFirst from using the site to obtain boarding passes for Southwest customers for commercial purposes. BoardFirst has been made aware that its use of the

Southwest site violates the Terms, and Kate Bell herself admits that she does not have Southwest's authorization to use the site.  (Pl. App. 98).

That said, the question remains whether BoardFirst violated the CFAA simply by virtue of its breach of the Terms.  Congress did not define the phrase "without authorization", *see Phillips*, 477 F.3d at 219, but it did include a definition of the phrase "exceeds authorized access", which "means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter."  18 U.S.C. § 1030(e)(6).  A number of courts in other jurisdictions have indicated, consistent with Southwest's theory, that a computer use which violates the terms of a contract made between a user and the computer owner is unauthorized or "exceeds authorized access", and hence violates the CFAA.  *See e.g.*, *EF Cultural Travel BV v. Zefer Corp.*, 318 F.3d 58, 62 (1ˢᵗ Cir. 2003) (noting that "[a] lack of authorization could be established by an explicit statement on the website restricting access," giving rise to a CFAA violation if a website user thereafter violated the terms of use); *EF Cultural Travel BV v. Explorica, Inc.*, 274 F.3d 577, 582-82 (1ˢᵗ Cir. 2001) (finding that defendant's use of a computerized "scraper" to glean information from plaintiff's website likely exceeded authorized access where such use at least implicitly violated a confidentiality agreement); *Southwest Airlines v. Farechase, Inc.*, 318 F.Supp.2d 435, 439-40 (N.D. Tex. 2004) (finding that Southwest sufficiently stated CFAA claim where Southwest had directly informed the defendant that its scraping of southwest.com was unauthorized); *Register.com, Inc. v. Verio, Inc.*, 126 F.Supp.2d 238, 251 (S.D.N.Y. 2000) (finding that plaintiff successfully established that defendant's use of its website was unauthorized within the meaning of the CFAA simply by virtue of the fact that plaintiff objected to the defendant's use); *Am. Online, Inc. v. LCGM, Inc.*, 46 F.Supp.2d 444, 450 (E.D. Va. 1998) (concluding that defendants' use

of AOL membership to harvest e-mail addresses of AOL users was unauthorized because such actions violated AOL's terms of service). These cases, however, have received their share of criticism from commentators. *See e.g.* Christine D. Galbraith, *Access Denied: Improper Use of the Computer Fraud and Abuse Act to Control Information on Publicly Accessible Internet Websites*, 63 MD. L. REV. 320, 368 (2004) (arguing that the CFAA was designed to prevent computer hacking and "was never intended to afford website owners with a method for obtaining absolute control over access to and use of information they have chosen to post on their publicly available Internet sites); Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L. REV. 1596, 1600 (Nov. 2003) (proposing "that courts should reject contract-based notions of authorization, and instead limit the scope of unauthorized access statutes to cases involving the circumvention of code-based restrictions."); Mark A. Lemley, *Place and Cyberspace*, 91 CAL. L. REV. 521, 528 (March 2003) ("An even more serious problem is the judicial application of the [CFAA], which was designed to punish malicious hackers, to make it illegal – indeed, criminal – to seek information from a publicly available website if doing so would violate the terms of a 'browsewrap' license.").

Albeit in the criminal context, the Fifth Circuit has recently discussed the meaning of "authorization" under the CFAA in *United States v. Phillips*, 477 F.3d 215 (5th Cir. 2007). The *Phillips* Court noted that certain provisions of the CFAA make distinctions between unauthorized users and those who "exceed[] authorized access." *Id.* at 219. Relying on the legislative history of the CFAA, the Court stated that "[i]n conditioning the nature of the intrusion in part on the level of authorization a computer user possesses, Congress distinguished between 'insiders, who are authorized to access a computer,' and 'outside hackers who break into a computer.'" *Id.* at 219

(quoting S.REP. NO. 104-357, at 11 (1996)). It then went on to discuss the Second Circuit's decision in *United States v. Morris*, 928 F.2d 504 (2nd Cir. 1991), which is credited with introducing the "intended function test" for determining whether access to a computer is unauthorized. This test focuses on whether the user accessed a computer in a way that is related to its intended function. In *Morris*, for example, the Second Circuit had found that in transmitting a computer program "worm" into the internet for the purpose of exploiting security defects in various computer networks, the defendant did not use the computer systems "in any way related to their intended function." *Id.* at 510. Likewise, in *Phillips*, the Fifth Circuit found that a university student's use of various programs to scan computer networks and steal encrypted data and passwords "was not an intended use of the [university's] network within the understanding of any reasonable computer user and constitutes a method of obtaining unauthorized access to computerized data that he was not permitted to view or use." *Phillips*, 477 F.3d at 220.

In contrast to the situations in *Morris* and *Phillips*, it is at least arguable here that BoardFirst's access of the Southwest website is not at odds with the site's intended function; after all, the site is designed to allow users to obtain boarding passes for Southwest flights via the computer. In no sense can BoardFirst be considered an "outside hacker[] who break[s] into a computer" given that southwest.com is a publicly available website that anyone can access and use. True, the Terms posted on southwest.com do not give sanction to the particular *manner* in which BoardFirst uses the site – to check in Southwest customers for financial gain. But then again § 1030(a)(2)(C) does not forbid the *use* of a protected computer for any prohibited *purpose*; instead it prohibits one from intentionally *accessing* a computer "without authorization". As previously explained, the term "access", while not defined by the CFAA, ordinarily means the "freedom or ability to . . . make use

of" something.  Here BoardFirst or any other computer user obviously has the *ability* to make use of southwest.com given the fact that it is a publicly available website the access to which is not protected by any sort of code or password.  *Cf. Am. Online*, 121 F.Supp.2d at 1273 (remarking that it is unclear whether an AOL member's violation of the AOL membership agreement results in "unauthorized access").

Whether such use is "without authorization", for now, shall remain an open question, particularly given the relative inattention the parties have paid to the issue in their summary judgment papers (Southwest cites to only one case interpreting the meaning of unauthorized access under the CFAA while BoardFirst has cited none at all) and the lack of clarity as to whether Southwest is proceeding under the "without authorization" or "exceeds authorized access" prong of § 1030(a)(2)(C).  The Court will allow the parties to submit trial briefs on these issues no later than October 1, 2007.  In their briefs the parties may also wish to address whether the "rule of lenity" – which counsels courts to construe ambiguities in a criminal statute, even when applied in a civil setting, in a narrow way – should apply to this Court's interpretation of the CFAA.  *See e.g. Lockheed Martin Corp. v. Speed*, 2006 WL 2683058, at *7 (M.D. Fl. Aug. 1, 2006) ("To the extent 'without authorization' or 'exceeds authorized access' can be considered ambiguous terms, the rule of lenity, a rule of statutory construction for criminal statutes, requires a restrained, narrow interpretation.").

Even assuming that Southwest is able to prove unauthorized access, it still must show that, by virtue of such access, BoardFirst obtained information from a "protected computer" and that "the conduct involved an interstate or foreign communication."  18 U.S.C. § 1030(a)(2)(C).  Under the CFAA a "protected computer" may be one "which is used in interstate or foreign commerce or communication[.]"  18 U.S.C. § 1030(e)(2)(B).  Southwest has submitted evidence showing that

its website is hosted on Southwest's computer system located in Dallas, Texas and that the system engages in interstate commerce and communication on a daily basis.  (Pl. App. 115-16).  But for purposes of a § 1030(a)(2)(C) violation, Southwest must do more; it must also establish that BoardFirst obtained "information" from its protected computer as a result of the unauthorized use. Southwest points to no evidence on that score.  Nor has it shown that BoardFirst's use of its computer itself "involved an interstate or foreign communication" as required by the statute.  For these reasons, and construing the available evidence in a light favorable to BoardFirst, the Court finds that Southwest has failed to establish its entitlement to summary judgment on its CFAA claim.

Nor has Southwest proved as a matter of law that it has satisfied the requisite amount of "damage" or "loss" required by the CFAA.  In its summary judgment brief Southwest suggests that BoardFirst's conduct has caused Southwest damage in excess of the statute's requisite $5,000 threshold.  (Pl. MSJ Brief 21).  Under the CFAA, the term "damage" means "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8)(A). There is no evidence in this case that BoardFirst has impaired the integrity of Southwest's computer system in any way.

Southwest may still maintain a civil cause of action, however, if it shows that it suffered a "loss" of more than $5,000 during any one-year period.  Under the CFAA "loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).  As evidence of "loss", Southwest cites to the declaration of Jill Howard Allen, Southwest's corporate representative on damages, who states only

that "Southwest spent at least $6,500 within a single one year period in investigating and responding to BoardFirst's unauthorized access to Southwest's computer system."  (Pl. App. 118).[5]  While investigative and responsive costs fit within the concept of "loss" as used in the CFAA, *see e.g. Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 2007 WL 2085358, at *18 (E.D. Pa. July 20, 2007) and *P.C. of Yonkers, Inc. v. Celebrations! The Party and Seasonal Superstore, L.L.C.*, 2007 WL 708978, at *5 (D.N.J. March 5, 2007), the Court finds that Allen's fairly conclusory testimony, taken alone, is insufficient to prove as a matter of law that Southwest has proven "loss" under § 1030(a)(5)(B)(i).   Allen fails to identify the precise steps taken by Southwest in "investigating and responding to" BoardFirst's unauthorized access.  There is thus no basis upon which the Court may determine whether Southwest's responsive efforts constitute "reasonable" costs incurred by the company due to BoardFirst's purported unauthorized access of the Southwest computer system.  18 U.S.C. § 1030(e)(11) (stating that "loss" means "any *reasonable* cost to any victim . . ..)"  (emphasis added).  For all of the reasons just discussed, the Court finds that Southwest is not entitled to summary judgment on its claim under the CFAA.

## E.     Harmful Access to Computer Claim Under Texas Law

Southwest also seeks to hold BoardFirst liable for violating Chapter 143 of the Texas Civil Practices and Remedies Code, which allows a civil cause of action by "a person who is injured or whose property has been injured as a result of a violation under Chapter 33, Penal Code, . . . if the conduct constituting the violation was committed knowingly or intentionally."  TEX. CIV. PRAC. &

---

[5]  BoardFirst contends that Allen's deposition testimony, given two days before Allen made her declaration, "demonstrates that her Declaration is not accurate."  (Def. Resp. Brief at 9).  BoardFirst fails to cite to any evidence to support any such discrepancy, however.  *See* LOC. R. N.D. TEX. 56.5(c).

REM. CODE § 143.001(a).  Southwest claims that BoardFirst's intentional use of its website for improper commercial purposes constitutes a violation of § 33.02(a) of the Texas Penal Code, which makes it an offense for a person to "knowingly access[] a computer, computer network, or computer system without the effective consent of the owner."

There is no dispute here that in conducting its business BoardFirst knowingly accesses Southwest's computer system, located in Dallas.  Nor can there be any real dispute whether that access was "without the effective consent of the owner."  Section 33.01 of the Texas Penal Code defines the phrase "effective consent" negatively by providing that "[c]onsent is not effective if . . . used for a purpose other than that for which the consent was given."  TEX. PENAL CODE § 33.01(12)(E).  Because southwest.com is a publicly available website, in a sense it may be said that Southwest invites or gives consent to virtually anyone to use it.  Southwest conditions such use, however, on compliance with the Terms, which, as discussed at length above, forbid the site from being used for commercial purposes and expressly prohibit third parties from using the site to check in Southwest passengers for flights.  BoardFirst's use of the Southwest site falls squarely within these prohibitions, and Bell has admitted that BoardFirst does not have Southwest's authorization to use the site in the manner in which it does.  (Pl. App. 98).  Because the undisputed summary judgment evidence shows that BoardFirst uses Southwest's computer "for a purpose other than that for which the consent was given", BoardFirst lacks Southwest's effective consent in using the site.  By knowingly accessing Southwest's computer without Southwest's effective consent, the Court finds that BoardFirst has violated § 33.02 of the Texas Penal Code as a matter of law.

Having established a § 33.02 violation, Southwest may maintain a civil cause of action against BoardFirst under § 143.001 of the Texas Civil Practice and Remedies Code provided that

it can show that it has been "injured" by reason of BoardFirst's § 33.02 violation.  To support its claim of injury, Southwest refers the Court to its discussion of its claim for "damage" or "loss" with respect to its CFAA claim.  (Pl. MSJ Brief at 23).  "Damage" and "loss", however, are defined terms that carry specialized meanings under the CFAA, whereas § 143.001 speaks in terms of a person who is "injured".  Southwest has failed to demonstrate that its discussion of "damage" or "loss" in connection with its CFAA claim is translatable to its § 143.001 claim.  For instance, while certain investigative and responsive costs may be recoverable as a "loss" under the CFAA, Southwest provides no authority that the same types of costs constitute an "injury" within the meaning of § 143.001.  The Court finds that Southwest's § 143.001 claim shall therefore remain for trial.

**F.    Southwest Has Demonstrated its Entitlement to a Permanent Injunction**

Southwest seeks to permanently enjoin BoardFirst from using the Southwest site in violation of the Terms.  To be entitled to a permanent injunction Southwest must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that the injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest.  *See VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006).

As discussed above, Southwest has established its entitlement to summary judgment on its breach of contract claim despite its inability to prove an amount of damages.  Thus, the first element is satisfied.  Southwest next must demonstrate that it would be irreparably harmed if the Court did not grant a permanent injunction.  "Under Texas law, the irreparable harm required for a permanent injunction is defined as 'an injury which cannot be compensated or for which compensation cannot be measured by any certain pecuniary standard.'"  *See Molex, Inc. v. Nolen*, 759 F.2d 474, 477 (5th

Cir. 1985) (quoting *Parkem Indus. Servs., Inc. v. Garton*, 619 S.W.2d 428, 430 (Tex. Civ. App. –

Amarillo 1981, no writ)).  And while contracts are generally not enforceable through injunctive relief

when damages provide an adequate remedy, "[i]t is settled law in Texas that performance of a

contract may be specifically enforced by an injunction restraining acts in violation of the contract,

such being, in effect, a negative decree of specific performance." *Fuller v. Walter E. Heller & Co.*, 483

S.W.2d 348, 351 (Tex. Civ. App. – Dallas 1972, no writ); *MW Petroleum Corp. v. Exxon Corp.*, 1997

WL 634159, at *4 (Tex. App. – Houston [14th Dist.] Oct. 16, 1997, no writ); 14 TEX. JUR. 3D

CONTRACTS § 337 (2007) ("[U]nder appropriate circumstances injunctive relief will lie for wrongs

involving contractual rights, and in cases where an award of damages cannot adequately compensate

for the breach, injunction may lie to prevent the breach, or to restore the status quo."); *see also Verio,*

*Inc.*, 356 F.3d at 404 ("It is true that specific relief is not the conventional remedy for breach of

contract, but there is certainly no ironclad rule against its use."); *Verio, Inc.*, 126 F.Supp.2d at 248

("[E]ven where damages are available, irreparable harm may be found where those damages are

clearly difficult to assess and measure.").

       Southwest has put forward evidence that the economic harm caused to it by BoardFirst's

conduct is inherently difficult if not impossible to quantify.  (Pl. App. 42).  BoardFirst fails to

contradict this evidence beyond making the conclusory and unsupported statement that it is

"inconceivable that the failure to grant such an injunction will cause Southwest irreparable harm."

(Def. Resp. Brief at 11).  Because Southwest is not able to calculate the amount of economic harm

it has suffered by reason of BoardFirst's activities with any fair degree of precision, the Court finds

that Southwest would be irreparably harmed absent entry of a permanent injunction.  *See Verio*, 356

F.3d at 404 (affirming district court's finding of irreparable harm where defendant's use of plaintiff's

website in violation of site's terms of use "would cause [plaintiff] irreparable harm through loss of reputation, good will, and business opportunities."); *Union Nat'l Life Ins. Co. v. Tillman*, 143 F.Supp.2d 638, 645 (N.D. Miss. 2000) ("Irreparable harm exists 'even where economic rights are involved, when the nature of those rights makes establishment of the dollar value of the loss . . . especially difficult or speculative.'") (quoting *Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 (5th Cir. 1989)).

Next, the Court considers whether the injury suffered by Southwest as a result of BoardFirst's activities outweighs any damage that an injunction would cause to BoardFirst. As earlier discussed, Southwest has shown that BoardFirst's business diverts traffic flow away from southwest.com and interferes with the brand image Southwest intends to project. Though perhaps unquantifiable, these injuries are none the less real. As for BoardFirst, it seems inescapable that the entry of a permanent injunction here would effectively put the company out of business. That eventuality, however, is entirely a function of the fact that BoardFirst's niche business is completely dependent on an impermissible use of the Southwest website. BoardFirst's interest in using the Southwest website in breach of the Terms cannot outweigh Southwest's legitimate interest in maximizing selling opportunities from its own website and in protecting its brand image. *Cf. Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir.1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."); *United States v. Diapulse Corp. of Am.*, 457 F.2d 25, 29 (2nd Cir. 1972) (finding that one "can have no vested interest in a business activity found to be illegal.") (quotations and citation omitted).

Finally, the Court analyzes whether the issuance of a permanent injunction against BoardFirst

would disserve the public interest.  As pointed out by Southwest, the public has an interest in seeing contractual arrangements enforced.  *See Corporate Relocation, Inc. v. Martin*, 2006 WL 4101944, at *18 (N.D. Tex. Sept. 12, 2006) ("The public has an interest in knowing and understanding that persons who breach their agreements may not profit or otherwise benefit from such conduct.").  For its part, BoardFirst has failed to identify a single way in which the public would be disserved by the issuance of a permanent injunction.   Perhaps some of BoardFirst's patrons, for whom the convenience of being able to board a Southwest plane in the "A" group is well worth the $5 they pay to do so, may be disgruntled if BoardFirst is no longer permitted to offer its services.  But any such disappointment does not in any way mean that the public at large is disserved by an injunction.  The Court can discern no public injury that will attend the issuance of an injunction here.

Southwest has demonstrated each of the necessary requirements for the issuance of a permanent injunction.  Accordingly, the Court finds that BoardFirst should be permanently enjoined from using southwest.com in a way that breaches the Terms posted on the site.

## G.    BoardFirst's Counterclaims for Tortious Interference

BoardFirst has filed counterclaims against Southwest for tortious interference with its contractual relationship with the Hertz Corporation, contractual relationships with its own customers, and prospective contractual relationships with its own customers.  Southwest has moved for summary judgment on all of these counterclaims.  In its response, BoardFirst indicated its non-opposition to Southwest's summary judgment motion on all but its claim for tortious interference concerning its contract with Hertz.  (Def. Resp. 1).  BoardFirst and Hertz entered into a marketing agreement effective April 1, 2006 pursuant to which BoardFirst posted a hyperlink to Hertz's website on its own website in exchange for Hertz paying BoardFirst a percentage of revenues Hertz generated

through the link.  (Def. App. 124-126; Def. Countercl.¶ 4).  BoardFirst claims that, soon after Southwest learned of BoardFirst's affiliation with Hertz, a Southwest representative contacted Southwest's Hertz contact and communicated to him false and defamatory information about BoardFirst intending to interfere with BoardFirst's contractual relationship with Hertz.  Having considered the summary judgment evidence and the arguments of the parties, the Court finds that fact issues exist with respect to BoardFirst's remaining tortious interference claim, making summary judgment inappropriate.

### III.  Conclusion

For the foregoing reasons the Court GRANTS Southwest's motion for partial summary judgment in part and DENIES it in part.  The Court GRANTS the motion with respect to Southwest's breach of contract claim and its request for the entry of a permanent injunction against BoardFirst.  The Court further GRANTS the motion in Southwest's favor with respect to BoardFirst's counterclaims for tortious interference with BoardFirst's contractual relationships with its customers and prospective contractual relationships with its customers (Counts II and III of BoardFirst's Counterclaim).  The Court DENIES the motion with respect to Southwest's claims under the CFAA, 18 U.S.C. § 1030, and under § 143.001 of the Texas Civil Practice and Remedies Code.  As discussed above, the parties may file trial briefs, due by October 1, 2007, on the issue of whether BoardFirst "intentionally access[ed]" a Southwest computer "without authorization" or "exceed[ed] authorized access" within the meaning of the CFAA.  The Court further DENIES Southwest's motion with respect to BoardFirst's counterclaim for tortious interference with its contractual relationship with Hertz.

SO ORDERED.

September 12th , 2007


_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE